Rupa G. Singh (SBN 214542)
**NIDDRIE | ADDAMS | FULLER | SINGH LLP**
600 West Broadway, Suite 1200
San Diego, CA  92101
Phone: 858.699.7278
Email: rsingh@appealfirm.com

Patrick J. Stark (SBN 149352)
**STARK & D'AMBROSIO, LLP**
501 West Broadway, Suite 960
San Diego, CA  92101
Phone: 619.338.9500
Email: patrick@starkllp.com

Attorneys for Respondents ANDREA
HUNSINGER AND ANDREA HUNSINGER
JOLLY, AN INSURANCE SERVICES CORP.,
DBA ADVANCED WEALTH PLAN

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER GELLMAN, and PALMERSTON GROUP INDEMNITY SOLUTIONS, LLC,<br><br>Claimants,<br><br>v.<br><br>ANDREA HUNSINGER AND ANDREA HUNSINGER JOLLY, AN INSURANCE SERVICES CORP., DBA ADVANCED WEALTH PLAN<br><br>Respondents. | Case No. 18-cv-2641 BAS (AGS)<br><br>**RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE FINAL ARBITRATION AWARD**<br><br>Judge:       Hon. Cynthia Bashant<br>Courtroom:  4B<br>Date:         June 28, 2021<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS ...........................................................................i

TABLE OF AUTHORITIES .....................................................................iii

I.      INTRODUCTION .................................................................................1

II.     STATEMENT OF THE CASE.............................................................2

     A.     The Parties: Financial Advisors and Planners Who Sell
          Insurance.........................................................................................2

     B.     The Agreement: An Insurance Sales Commission Sharing
          Agreement.......................................................................................3

     C.     Arbitration: Demand, Motion to Compel, and Answer.......................4

     D.     Arbitral Proceedings: Discovery Orders and Summary Judgment......4

     E.     Arbitration: Interim and Final Award.................................................6

III.    STATEMENT OF JURISDICTION AND TIMELINESS ....................10

IV.    ARGUMENT AND DISCUSSION ........................................................11

     A.     The Arbitrator Manifestly Disregarded California Law Prohibiting
          Gellman from Soliciting Life Insurance Without a License by
          Purporting to Make a Factual Determination that Gellman Did Not
          Engage in "Sufficient" Solicitation to Need a License but Just
          Enough to Be Owed Commissions from the Sale of Life
          Insurance .......................................................................................11

     B.     The Arbitrator's Damages Award Manifestly Disregards the Law
          Prohibiting Attorneys' Fees Without Contractual or Statutory Basis,
          Emotional Distress Damages for Mere Breach of Contract Without

i

an Independent Tort, and Punitive Damages for Litigation
Conduct.................................................................................17

    1.    Attorneys' Fees Were Not Allowed by Contract or
Statute………………………………………….............17

    2.    No Emotional Distress Damages Flow from Breach of Contract
Absent Physical Harm or Specialized Facts Not Present
Here.................................................................................18

    3.    Punitive Damages are Prohibited for Litigation Conduct and
Require an Underlying Tort and Evidence of Ability to
Pay.................................................................................20

**V.**    **CONCLUSION**.................................................................25

ii

# TABLE OF AUTHORITIES

Page

## CASES

*Adams v. Murakami*
    54 Cal.3d 105 (1991) ...............................................................................24, 25

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*
    421 U.S. 240 (1975) ..........................................................................................17

*Am. Reliable Ins. Co. v. Stillwell*
    336 F.3d 311 (4th Cir. 2003) ...........................................................................18

*Bosack v. Soward*
    586 F.3d 1096 (9th Cir. 2009) .........................................................................11

*Branch v. Homefed Bank*
    6 Cal.App.4th 793 (1992) .................................................................................19

*Buckhannon Bd. & Care Home, Inc. v. West Virginia Dept. of
    Health & Human Res.*
    532 U.S. 598 (2001) ..........................................................................................17

*Butler-Rupp v. Lourdeaux*
    134 Cal.App.4th 1220 (2005) .....................................................................19, 20

*Chelini v. Nieri*
    32 Cal.2d 480 (1948) ........................................................................................22

*Cnty. of Yolo v. Los Rios Cmty. Coll. Dist.*
    5 Cal.App.4th 1242, 1257 (1992) ....................................................................15

*De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz
    Mobile Estates*
    94 Cal.App.4th 890 (2001) ...............................................................................20

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*
    11 Cal.4th 376 (1995) .......................................................................................22

iii

*Electrolux Home Prods., Inc. v. United Auto., Aerospace & Agric. Implement Workers of Am.*
   343 F.Supp.2d 747 (N.D. Iowa 2004) ...........................................................18

*Erlich v. Menezes*
   21 Cal.4th 543 (1999) .................................................................19, 23

*Fewel & Dawes, Inc. v. Pratt*
   17 Cal.2d 85 (1941) ....................................................................15, 16

*Friedman v. AARP, Inc.*
   855 F.3d 1047 (9th Cir. 2017) .............................................................12

*Gherardi v. Citigroup Global Mkts. Inc.*
   975 F.3d 1232 (11th Cir. 2020) ............................................................23

*Ginns v. Savage*
   61 Cal.2d 520 (1964) .....................................................................15

*Houston v. Williams*
   53 Cal.App. 267 (1921) ...............................................................16, 17

*Karlsson v. Ford Motor Co.*
   140 Cal.App.4th 1202 (2006) ..............................................................20

*Korea Supply Co. v. Lockheed Martin Corp.*
   29 Cal.4th 1134 (2003) ...............................................................22, 23

*Kurtin v. Elieff*
   215 Cal.App.4th 455 (2013) ...............................................................23

*Lagstein v. Certain Underwriters at Lloyd's, London*
   607 F.3d 634 (9th Cir. 2010) .............................................................10

*Metallgesellschaft A.G. v. M/V Capitan Constante*
   790 F.2d 280 (2d Cir. 1986) ..............................................................11

*Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*
   44 F.3d 826 (9th Cir. 1995) ..............................................................23

iv

*Miller v. Nat'l Am. Life Ins. Co.*
    54 Cal.App.3d 331 (1976) ...................................................21

*Multifamily Captive Grp., LLC v. Assurance Risk Managers, Inc.*
    578 F.Supp.2d 1242 (E.D. Cal. 2008) .................................17

*Myers Bldg. Indus., Ltd v. Interface Tech., Inc.*
    13 Cal.App.4th 949 (1993) ................................................22

*Olle v. 5401 Western Ave. Residential, LLC*
    569 F.Supp.2d 141 (D.D.C. 2008) .....................................18

*Palmer v. Ted Stevens Honda, Inc.*
    193 Cal.App.3d 530 (1987) ................................................20

*Providence Journal Co. v. Providence Newspaper Guild*
    271 F.3d 16 (1st Cir. 2001) ................................................11

*Radich v. Cernokus*
    65 Cal.App. 452 (1924) .....................................................17

*Rutherford Holdings, LLC v. Plaza Del Rey*
    223 Cal.App.4th 221 (2014) ..............................................23

*Stevens v. Superior Court (API Ins. Servs., Inc.)*
    75 Cal.App.4th 594 (1999) ................................................20

*Vick v. Patterson*
    158 Cal.App.2d 414 (1958) ...............................................11

*Woods v. Fox Broad. Sub., Inc.*
    129 Cal.App.4th 344 (2005) ..............................................22

## STATUTES

9 U.S.C. § 10 ..................................................................10, 23

9 U.S.C. § 12 .......................................................................10

Cal. Civ. Code § 1635 .........................................................23

v

Cal. Civ. Code § 1636 .................................................................23

Cal. Civ. Code § 1638 .................................................................23

Cal. Civ. Code § 1639 .................................................................23

Cal. Civ. Code § 1667 .................................................................11

Cal. Civ. Code § 3294 ...........................................................21, 22

Cal. Ins. Code § 1631 .................................................................12

Cal. Ins. Code § 1633 .....................................................12, 16, 17

## OTHER

Cal. Prac. Guide: Alt. Disp. Res. Ch. 5-H, § 5:388.10d (Rutter
    Group 2021) .................................................................11

vi

# I.     **INTRODUCTION**

Andrea Hunsinger and Andrea Hunsinger Jolly, an Insurance Services Corp., dba Advanced Wealth Plan (collectively Hunsinger) move to vacate the underlying Final Arbitration Award on two grounds under Section 10(a)(4) of the Federal Arbitration Act. The Arbitrator exceeded his powers by manifestly disregarding the law in both enforcing an illegal contract and awarding unauthorized damages.

First, California law prohibits a party from sharing commissions from the solicitation or sale of life insurance contracts without being a licensed insurance broker in this state. As Claimant Peter Gellman (Gellman) admitted repeatedly, the only purpose of the agreement underlying this dispute was to generate and share commissions from the sale of life insurance. In his arbitration demand, Gellman sought a share of commissions he allegedly helped generate from the sale of life insurance to prospects solicited in California. At his deposition, Gellman readily admitted that the basis of his claim and the extent of his recovery was tied to his alleged assistance to Hunsinger's marketing efforts in California to sell life insurance to high net-worth prospects. Ignoring settled insurance law, the Arbitrator allowed Gellman to backtrack by asserting, for example, that he never used the word "insurance" in his presentations to prospects; that he or the prospects were not physically in California when insurance was discussed; that he obtained a California license once this dispute arose; and that the policy at issue was sold under Nevada law anyway. Manifestly disregarding the law prohibiting Gellman from solicitating without a license, the Arbitrator relied on Gellman's subjective beliefs to find that he did not engage in "sufficient" solicitation and enforced an illegal agreement whereby Gellman could share in commissions from the sale of life insurance solicited in California when he was not licensed in this state.

Second, California law unequivocally prohibits an award of attorneys' fees not allowed by statute or contract; of punitive damages for a party's litigation

conduct; and of emotional distress damages for reclassifying conduct underlying breach of a contract as tortious. Nevertheless, the Arbitrator awarded Gellman fees incurred in compelling arbitration without contractual or statutory authorization. The Arbitrator also awarded Gellman emotional distress damages by construing the same conduct that constituted Hunsinger's alleged breach of contract as tortious. Next, the Arbitrator improperly awarded punitive damages for Hunsinger's alleged discovery misconduct, evasive testimony, and failure to pay arbitration fees instead of evaluating whether her pre-dispute conduct towards Gellman showed malice, fraud, or oppression. These damages were also fundamentally unfair because the Arbitrator ignored evidence of Hunsinger's inability to pay and excused Gellman from establishing otherwise. Had such an inquiry occurred, Hunsinger would have supplemented evidence submitted informally to further establish that she depleted her savings as a result of suffering domestic violence and paying legal fees for that and the present dispute; that she owned no assets; that she earned little during the pandemic due to setbacks to the insurance industry; and that she could not rely on future earnings given the risk to her license from findings underlying the punitive damages award. By ordering unauthorized fees plus damages to punish Hunsinger for litigation conduct or "bad faith" in allegedly breaching the contract, the Arbitrator exceeded his powers.

Accordingly, Hunsinger requests that this Court vacate the Arbitration Award in full as exceeding the Arbitrator's powers, or, at the very least, vacate the unauthorized attorneys' fees and exemplary damages award totaling $383,400.

## II.   STATEMENT OF THE CASE

### A.   The Parties: Financial Advisors and Planners Who Sell Insurance

Gellman is an experienced, New Jersey-based financial planner and life insurance agent, and the founder of Claimant Palmerston Group Indemnity

Solutions, LLC (collectively Gellman). (Ex. 1, 1–2.)[1] Gellman was licensed to sell life insurance in New Jersey since 2013, but only obtained non-resident licenses in California on October 31, 2017 and in Nevada on November 2, 2017. (Ex. 6, 507, 509, 511, 518 ¶19; RT 112:11–25, 115:9–16, 117:14–16.)[2] Hunsinger is a life insurance broker and financial advisor in San Diego, and owns Respondent Andrea Hunsinger Jolly, an Insurance Services Corp., dba Advanced Wealth Plan (collectively Hunsinger). (*Id*. at 1.) She has had a California insurance broker license since 2007, plus a real estate agent license to advise clients with real estate holdings. (Ex. 6, 460:20–25, 533–534; RT 224:9, 748:17–20; 754:17–25.)

B.      The Agreement: An Insurance Sales Commission Sharing Agreement

Underlying this dispute is the parties' January 26, 2017 Commission Sharing Agreement (the Agreement) under which Gellman and Hunsinger agreed to "function as joint agents or brokers on all insurance contracts" and "split commissions for all such insurance contracts between themselves evenly." (Ex. 1, 1, 12 ¶1, 17.) The Agreement disavowed creating s "co-venturer or partner" relationship between the parties; stated that they were independent contractors; and stated that each party "warrants and represents" that it "is properly licensed and/or certified to solicit and/or transact insurance business pursuant to applicable federal, state, local laws and regulations[.]" (*Id*. at 13, ¶¶9, 13.) Under the Agreement, Hunsinger arranged seminars and meetings in San Diego "to find potential clients of life insurance," and Gellman traveled here five times in January, March, April, June, and September 2017 "to meet with prospective insurance customers." (*Id*. at 1; Ex. 6, 415:23–416:1, 422:14–19, 516 ¶10; RT 666:18–668:3.)

Two relevant prospects as to whom the parties introduced significant

_____

[1] All exhibits are submitted with Respondents' Index of Exhibits, Exs. 1–37.

[2] RT refers to the concurrently lodged Reporter's Transcript, 1–1003.

1   evidence were as follows: (1) Richard Glassman (Glassman), to whom Hunsinger

2   previously almost finalized the sale of life insurance and who met Gellman twice,

3   and (2) Robert Morris (Morris), who Glassman referred as a prospect but never

4   met or spoke to Gellman. (Ex. 6, 483:19–25, 501:14–25, 536–537 ¶¶2–3, 548 ¶¶7–

5   8, 549 ¶13; Morris Decl., ¶4; RT 38:25–39:2, 43:16–21, 44:10–11, 302:10–303:9,

6   414:21–415:2, 577:13–19; 770:15–771:16, 782:13–784:24, 894:4–15.) In late

7   October 2017, Hunsinger told Gellman that they could not work together after a

8   dispute arose between the parties about whether these prospects were Hunsinger's

9   pre-existing clients or whether they were encompassed by the Agreement for

10   purposes of sharing commissions. (Ex. 6, 516 ¶¶11–12; RT 424:2–426:20.)

11       C.    <u>Arbitration: Demand, Motion to Compel, and Answer</u>

12          Per the Agreement's arbitration clause, Gellman filed a demand for

13   arbitration on August 21, 2018, alleging eight claims for breach of contract,

14   intentional and negligent interference with prospective economic relationship,

15   breach of fiduciary duty, intentional and negligent misrepresentation, conversion,

16   and money had and received. (Ex. 1, 4–10, 14 ¶17.) He sought actual, general, and

17   punitive damages, plus fees and costs as well as injunctive and declaratory relief.

18   (*Id*. at 10.) After initially refusing to arbitrate because Gellman's lack of an

19   insurance license rendered the Agreement illegal and because her company was not

20   a signatory to the Agreement, Hunsinger agreed to arbitrate individually once

21   Gellman moved to compel arbitration. (Ex. 6, 156–57, 160–61.) This Court then

22   granted in part the motion to compel arbitration as to Hunsinger's company. (*Id*. at

23   161–62.) Hunsinger asserted several defenses to the arbitration demand, including

24   that Gellman's lack of a California license during most of the Agreement's term

25   made it illegal and that there was no basis for punitive damages. (Ex. 2, 118–19.)

26       D.    <u>Arbitral Proceedings: Discovery Orders and Summary Judgment</u>

27          During discovery, the Arbitrator excluded Glassman and Morris, among

28

4

other witnesses, from testifying at the arbitration as a discovery sanction against Hunsinger for allegedly obstructing Gellman from taking their depositions (which Hunsinger and Morris deny). (Ex. 3, 124; Ex. 4, 126; RT 300:20–301:6; *see also* Hunsinger Decl. ¶22; Morris Decl. ¶¶3–4.) The Arbitrator also restricted Hunsinger from testifying about statements Glassman and Morris made in texts to her or otherwise. (RT 777:17–778:7, 862:4–9. 911:5–24.) Further, the Arbitrator drew adverse inferences about Hunsinger's credibility for deleting relevant text messages even though she said under oath that she had produced all responsive texts and any disparities were the result of first producing screenshots of her texts with ***Gellman*** and then producing printouts of texts with ***Glassman***. (Ex. 28, 2245; Ex. 6, 479:8–479:2, 544 ¶¶21–23; *compare id.* at 557–716 *with id.* at 718–1036, 1038; RT 912:24–916:24, 922:9–924:17, 932:19–938:22; *see also* Hunsinger Decl. ¶22.) Even though Hunsinger repeatedly told the Arbitrator via his staff that she could not afford her share of arbitration fees due to personal circumstances (such as being a single mother with no childcare) and business setbacks (such as collecting unemployment due to the pandemic's impact on the insurance industry (Hunsinger Decl. ¶¶3 & Exs. 35–37), the Arbitrator deemed her in "breach" of her duty to fund "half of this arbitration" and limited the arbitral hearing to three days to limit Gellman's daily fees (RT 378:4–21, 998:2–999:3; Ex. 28, 2237, 2244).

Hunsinger moved for summary judgment on the ground that Gellman's lack of a California insurance license before and during most of the Agreement's term rendered it illegal. (Ex. 6.) Gellman responded that he did not "solicit" without a license because he did not mention insurance during his presentations, but only advocated a tax mitigation and estate, succession planning, and wealth management plan; because he was licensed in New Jersey and could get a non-resident license in California when needed; and because he secured a non-resident California license after Hunsinger purported to terminate the Agreement; and that.

5

(Ex. 7.) After full briefing and a hearing (Exs. 8–14, RT 53–101), the Arbitrator denied summary judgment, finding that whether Gellman sufficiently "solicited" life insurance in California was a disputed issue of fact on which Gellman could testify as an expert based on his New Jersey license. (Ex. 15.)

E.    Arbitration: Interim and Final Award

Following a three-day arbitration, the Arbitrator issued an "Arbitrator's Decision and Order After Hearing" on December 17, 2020 (the Interim Award), finding in Gellman's favor on all claims. (Ex. 25.) After Hunsinger moved to correct or modify the Interim Award under the AAA Rules, and seek clarification whether the Interim Award was final, the Arbitrator issued a "Final Award with Modifications and Clarifications" dated February 8, 2021 (the Final Award).

The Arbitrator limited the commissions subject to the Agreement to the Morris Policy placed in January 2018 and any future Glassmans' Policies, "to the extent that they ***either were earned during the relationship of the parties or that they come to fruition in the future because of Gellman's involvement in the sales work performed in the procurement.***" (Ex. 28, 2219–20.) Even though he found that Gellman had performed sufficiently under the Agreement to be entitled to commissions for the sale of life insurance policies, the Arbitrator somehow found that Gellman had not engaged in "sufficient" solicitation to violate California's prohibition against soliciting insurance without a license. (*Id.* at 2222.) But the overwhelming evidence presented on the issue of solicitation was to the contrary:

- ▪    Gellman alleged that he and Hunsinger arranged seminars and meetings in San Diego in 2017 "***to find potential clients of life insurance***" and that he traveled her to "***meet with prospective insurance customers***" (Ex. 1, 1);

- ▪    After alleging that he and Hunsinger met a prospective client "***to sell him a life insurance policy***," Gellman backtracked that there had been no "solicitation" during this "educational presentation" (*Compare* Ex. 1, 3 *with* RT

6

170:6–171:18, 545:16–546:5);

- Gellman testified that his proposal for prospective clients to form charitable LLCs necessarily involved financing the premiums for insurance policies to leverage changes in inheritance tax laws (Ex. 6, 193:4–16, 251:3–17, 252:8–17, 298:8–16; Ex. 16, 1597; RT 323:22–324:16, 732:19–22l; *see also* RT 818:14–819:7, 827:16–24);

- Gellman admitted he was not licensed to solicit insurance when he signed the Agreement and for eight months while he allegedly performed under it (between January 26 and October 31, 2017), testifying that it is illegal for anyone to collect commissions without a license (Ex. 6, 212:1–3; RT 492:24–492:5);

- While professing to be an expert on insurance licensing and commission sharing agreements nationally, Gellman admitted he did not "investigate" California law; was not "competent" to opine what "solicitation" means; and believed he did not need a California license until a policy was sold based on studying for his New Jersey license (*Compare* RT 252:14–253:11 *with* Ex. 6, 214:4–216:25, 217:21–25);

- While claiming that the seminars were only "educational," Gellman testified that he did "speak in passing about where life insurance might fit in – in general conceptual terms" and that the "insurance sales process" "certainly" began when he and Hunsinger had follow-up meetings in California with seminar attendees to sell them life insurance as part of a larger tax mitigation strategy (RT 257:10–17, 284:4–14; Ex. 6 at 217:7–218:25; RT 511:21–513:19);

- Before he got his non-resident California license in October 2017, Gellman alleged he was heavily involved in all aspects of selling Morris an insurance policy, such as being "included and working on the Morris Case . . . [including] in life insurance illustrations that had been generated" and being part of the "analytical process" to sell Morris an insurance policy (Ex. 6, 233:11–14,

7

237:14–19); working on the eventual placement of the Morris policy and having "conversations with Andrea Hunsinger about the Morris case" (Ex. 7, 1066; Ex. 8, 1147:13–20);

- ▪ Gellman also testified that Morris was referred to him and Hunsinger "on the insurance side" (Ex. 6, 238:3–13), that he helped discuss how "insurance fit it" with their overall planning (327:4–15), that his involvement was "substantive" (351:17–20), and that he was entitled to be Morris's *agent for insurance commissions* "because I worked on the case with Andrea Hunsinger" and discussed "different" insurance illustrations before being licensed in California on October 31, 2017 (Ex. 6, 239:5–9, 328:6–329:3; RT 408:10–24);

- ▪ While Gellman was unlicensed in California, he admitted to following up with a dozen "active" prospects here to be retained with Hunsinger as their "insurance professionals" yet disputed that this constituted solicitation (Ex. 6, 255:16–260:5, 268:1–269:4, 271:6–25; RT 386:3–387:17, 515:1–10); in fact, as to prospects known as four "teachers" who controlled a series of real estate limited partnerships, Gellman alleged he *made efforts to sell insurance* and admitted he and Hunsinger "would be placing insurance contracts together" (Ex. 6, 248:4–11);

- ▪ Gellman conceded he would only earn commission for "selling an insurance policy" as part of the overall financial planning effort, and that placing insurance policies was the sole purpose and goal of the parties' Agreement (Ex. 6, 254:21–255:15; RT 471:2–472:21, 597:24–598:11, 674:2–9);

- ▪ Gellman alleged he remained "*heavily involved in the Glassmans' purchasing of insurance throughout the year*, up to and including meeting with them in California and being copied on insurance illustrations sent to the Glassmans" (Ex. 1, 4; RT 298:5–25, 681:21–683:10);

- ▪ In addition to Gellman's allegations and admissions, three prospects with whom Gellman met or their lawyers testified that, during his seminar

8

presentations and follow-up meetings, Gellman was offering an investment that included an "insurance product" or "insurance element" as a "critical component" and that Gellman would make money by selling life insurance (RT 694:17–695:3, 698:17–22, 708:15–19, 712:3–6, 717:20–721:4, 725:16–24, 737:15–738:22);

- ▪ One prospective client who met Gellman in California after a seminar said flatly that Gellman *was* trying to sell her life insurance (RT 738:19–22);

- ▪ Hunsinger also testified that she expected Gellman to sell life insurance to be entitled to commissions under their Agreement (RT 807:15–19).

Despite this evidence of Gellman's admissions and allegations, corroborated by unimpeached third-party witness testimony, the Arbitrator reiterated in the Final Award that Gellman did not engage in "sufficient" solicitation of life insurance in California to violate the law but was nevertheless entitled to commissions from the sale of insurance policies he helped procure per the Agreement. (Ex. 28, 2222–24.)

With respect to the tort claims, the Arbitrator agreed with Gellman's characterization of Hunsinger's alleged breach of contract as tortious conduct. (*Id.* at 2237–42.) For example, he found that Hunsinger intentionally and negligently interfered with Gellman's prospective economic relationships with individuals like Morris or Glassman whom Hunsinger had invited to the seminars or follow-up meetings or who were referred to the parties "in furtherance of pursuing business *under the Agreement*. (*Id.* at 2238–39.) Similarly, the Arbitrator determined that Hunsinger's promise to split insurance commissions with Gellman *in the parties' Agreement* constituted an intentional and negligent misrepresentation because Hunsinger did not intend to do so and failed to do so. (*Id*. at 2240–41.) Next, notwithstanding the Agreement's express language that the parties were independent contractors and it should not be construed to create a joint-venture or partner relationship giving rise to fiduciary duties, the Arbitrator found that Hunsinger breached alleged fiduciary duties to Gellman as co-venturers or partners

9

by denying him his commissions and further participation *under the Agreement*.
(Ex. 1, 13 ¶9; Ex. 28, 2239–40.) The Arbitrator further deemed that Hunsinger's
conduct in withholding commissions owed to Gellman *under the Agreement*
constituted the tort of conversion. (*Id.* at 2242.)

In terms of relief, the Arbitrator awarded Gellman damages totaling
$692,057.14. (*Id.* at 2253.) Of this, amount $307,657.14 was for breach of contract,
statutory interest, and Hunsinger's share of arbitration fees. (*Ibid.*) The remainder
included $8,400 in attorneys' fees Gellman incurred to compel arbitration;
$100,000 in "emotional distress" damages; and $275,000 in punitive damages.
(*Ibid.*) For the reasons discussed, Hunsinger now moves to vacate the Final Award
in its entirety, or at least as to the award of attorneys' fees related to the motion to
compel arbitration, emotional distress damages, and punitive damages.

## III.  STATEMENT OF JURISDICTION AND TIMELINESS

As the Arbitrator previously determined, the Federal Arbitration Act (FAA)
governs this arbitration procedurally and California state law applies substantively
to the claims at issue. (Ex. 5, 149.) The FAA gives this Court jurisdiction to vacate
final arbitration awards, specifically where, as here, "the arbitrators exceeded their
powers, or so imperfectly executed them that a mutual, final, and definite award
upon the subject matter submitted was not made." 9 U.S.C. §10(a)(4). In the Ninth
Circuit, arbitrators exceed their powers when, in addition to interpreting or
applying the governing law incorrectly, they issue an award that is "completely
irrational" or that exhibits a "manifest disregard of law." *Lagstein v. Certain
Underwriters at Lloyd's, London*, 607 F.3d 634, 641 & n.5 (9th Cir. 2010).

This motion is also timely filed within three months of the arbitrator's "Final
Award with Modifications and Clarifications" dated February 8, 2021 (the Final
Award). (Exs. 27–28); 9 U.S.C. §12. Claimants may argue untimeliness because
the Arbitrator issued the "Arbitrator's Order and Decision After Hearing" on

10

December 17, 2020 (the Interim Award) and the FAA allows certain interim awards to be challenged or confirmed in federal court. However, this rule applies under circumstances not present here, such when an award titled "partial final award" is issued to dispose of a separate, independent claim finally and completely or to adjudicate issues that the parties agree to bifurcate. *E.g., Metallgesellschaft A.G. v. M/V Capitan Constante*, 790 F.2d 280, 282–83 (2d Cir. 1986) (confirming arbitral determination of liability for freight charges in "partial final award" because it was, and could be reviewed, independent of remaining claims for fuel shortages and contamination); *Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 16, 19 (1st Cir. 2001) (formal or informal agreement to bifurcate issues makes resulting liability determination final for immediate review); Cal. Prac. Guide: Alt. Disp. Res. Ch. 5-H, §5:388.10d (Rutter Group 2021) (arbitrators customarily label less-than-final awards "partial final award" to allow review); *cf. Bosack v. Soward*, 586 F.3d 1096, 1103 (9th Cir. 2009) (en banc) (interim award may be deemed final if arbitrator states it is, or intends it to be, final). Here, the Interim Award was not titled "partial final award"; did not adjudicate bifurcated issues or independent claims; and was followed by issuance of the Final Award.

## IV.    ARGUMENT AND DISCUSSION

A.    <u>The Arbitrator Manifestly Disregarded California Law Prohibiting Gellman from Soliciting Life Insurance Without a License by Purporting to Make a Factual Determination that Gellman Did Not Engage in "Sufficient" Solicitation to Need a License but Just Enough to Be Owed Commissions from the Sale of Life Insurance</u>

A contract that is "contrary to an express provision of law" or has an illegal object is unenforceable. Cal. Civ. Code §1667; *Vick v. Patterson*, 158 Cal.App.2d 414, 417 (1958). Here, Gellman's solicitation of insurance contracts in California without a license renders the parties' Agreement unlawful.

California law provides that "a person shall not solicit, negotiate, or effect

11

contracts of insurance . . . unless the person holds a valid license from the commissioner authorizing the person to act in that capacity." Cal. Ins. Code | §1631. In fact, a person who "transacts" insurance "without a valid license . . . is guilty of a misdemeanor." Cal. Ins. Code §1633; *Stevens v. Superior Court (API Ins. Servs., Inc.)*, 75 Cal.App.4th 594, 604 n.9 (1999), as modified (Oct. 18, 1999) ("[T]ransacting insurance without a license [is not] a 'mere technical violation' as defendants contend; it is unlawful."). Though the Insurance Code does not define the term to "solicit" insurance, it has been interpreted to encompass more than the actual application for insurance, including marketing:

> [T]he California legislature intended "solicitation" to encompass **both** requests for "applications for [insurance] contracts," [Citation], **and** marketing if the "purpose of the method of marketing is the solicitation of insurance" by putting consumers in contact with an insurance agency or company [Citation].

*Friedman v. AARP, Inc.*, 855 F.3d 1047, 1054–55 (9th Cir. 2017) (emphasis added). In *Friedman*, a policyholder was found to sufficiently allege putative class claims against the AARP, among others, for "soliciting" or "transacting" insurance without a license by purchasing a supplemental group policy to cover health costs not covered by Medicare and marketing that policy to its members. *Id*. at 1049. In reversing the district court's narrow interpretation of "solicitation" under the Insurance Code, the Ninth Circuit noted that the AARP was contractually obligated to market the group plan to its members; that its members' inability to directly purchase or apply for insurance through the AARP was not dispositive; and that it was enough that the AARP's marketing materials were designed to lead its members to contact the insurer to consummate sales of insurance. *Id*. at 1052–54.

Like the AARP, Gellman too was contractually obligated under the parties' Agreement to market life insurance with any carriers with whom Hunsinger had

general agent and broker agreements. (Ex. 1, 12 ¶1.) And his presentations at seminars and follow-up meetings were also designed to lead prospective clients to consummate sales of insurance through Hunsinger's carriers. Nor does it matter that potential customers could not purchase insurance directly through Gellman. Indeed, Gellman essentially admitted that he engaged in marketing for the purpose of connecting prospective customers to insurance carriers through himself and Hunsinger by alleging and testifying that the only purpose of the Agreement was to sell life insurance; that the financial planning he discussed at the initial seminars in San Diego included insurance products; that the "insurance sales process" began during follow-up meetings with individual prospects; that prospects like Morris were referred to him and Hunsinger to be retained as insurance professionals; that he made efforts to sell insurance to various prospects; and that the only way he would make money under the Agreement was by selling an insurance policy.

Despite this law and evidence, the Arbitrator allowed Gellman to have it both ways by finding that he was ***not*** soliciting the sale of life insurance in California without a license between January 26, 2107 and October 31, 2017, when he secured his non-resident California license, but also finding that he ***was*** entitled to commissions from the sale of such insurance policies solicited during that time and encompassed by the parties' Agreement. If Gellman was performing under the Agreement by soliciting the sale of life insurance in California when he was unlicensed, he cannot seek commissions for illegal activity. But if Gellman did not perform under the Agreement by refusing to solicit the sale of life insurance products in California while he was unlicensed, he cannot seek commissions because he failed to perform contractual duties. Because the Arbitrator found that Gellman "dutifully performed his part of the bargain by presentations and conversations in an effort to generate comprehensive services for them, undoubtedly with the intent to ultimately generate significant insurance services,"

(Ex. 28, 2236), he necessarily solicited or transacted insurance without a license.

This is true even if the issue is narrowed to whether Gellman engaged in illegal solicitation in California with respect to the policy under Nevada law ultimately sold to Morris in 2018 or any policy encompassed by the Agreement that might be sold to the Glassmans. As to Morris, Gellman admitted that a "part" of his "theory of recovery" was that Gellman participated in seminars in California and presented information to follow-up prospects "with a mind to convincing [people] to buy insurance." (RT 30:15–33.) Glassman was one such prospect, who, after hearing Gellman, referred Morris. Nor does it matter that the policy ultimately issued to Morris was under Nevada law because the focus of the inquiry is the solicitation of life insurance through seminars and follow up meetings *in California* that led to Morris being a prospect covered by the Agreement. As to the Glassmans, Gellman admitted that the solicitation for life insurance "certainly" began during his and Hunsinger's follow up meetings with clients who attended the "educational" seminars, including the Glassmans.

As the Arbitrator said during the summary judgment hearing:

> They were seminars that were attempting to -- with free dinners, attempting to convince people that they should buy insurance. ***I mean, it defies logic to say that the seminars were not a solicitation***. How can you parse that?

(RT 17:2–6, emphasis added.) And yet, somehow, that is exactly what the Arbitrator ultimately allowed Gellman to do—to improperly parse his claim. As a result, Gellman was deemed to engage in some subjective level of "sufficient" solicitation that did not violate the Insurance Code but nevertheless constituted their procurement under a contract requiring him to sell life insurance policies to share in resulting commissions. Contrary to the Arbitrator's findings, the issue was not whether Gellman told Hunsinger he was not licensed in California or whether

14

Hunsinger believed otherwise; rather the issue is that Gellman violated the California Insurance Code by soliciting insurance business in California without a license and sharing in commissions from sales of insurance policies solicited with his assistance in California while he remained unlicensed.

To the extent the Arbitrator allowed Gellman to testify as an "expert" on his ability to secure a license by the time the Morris life insurance policy was placed, he ignored Gellman's concessions that his expertise was based on studying for his New Jersey license, and that Gellman had neither investigated California law nor could opine on what solicitation meant under California law. Regardless, no expert can opine on interpreting a statutory term such as "solicitation" as a matter of law; that is the Arbitrator's province, which he improperly ceded to Gellman in disregard of his duty to interpret the law. *Cnty. of Yolo v. Los Rios Cmty. Coll. Dist.*, 5 Cal.App.4th 1242, 1257 (1992) (rejecting economics expert's opinion as to the meaning of the word "costs" in the statute at issue because it is "the ultimate responsibility of the courts to interpret these statutes and say what is the law").

The Arbitrator also relied on inapposite cases, disregarding the law that cases do not stand for a proposition they did not consider. *Ginns v. Savage*, 61 Cal.2d 520, 524 n.2 (1964) ("Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered."). For example, in the case the Arbitrator relied on heavily, the California Supreme Court reversed a judgment upholding a contract to share commissions between a licensed insurance broker and unlicensed party whose corporation had a license but was not a party to the contract. *Fewel & Dawes, Inc. v. Pratt*, 17 Cal.2d 85, 90 (1941). In doing so, the Court stated that "It is true that an unlicensed person is not precluded from recovering a commission if he secured such license by the time the contract is performed, although it was executed prior to the time he was licensed." *Ibid*.

15

According to the Arbitrator, whereas the unlicensed party in *Fewel* never obtained a license, Gellman obtained a California license on October 31, 2018 and a Nevada license on November 2, 2017, before the Morris Policy was placed. But this narrow construction ignores that Section 1633 does not just require a license to place or "effect" an insurance contract, but also to "solicit" or "negotiate" an insurance contract. Here, as discussed, Gellman engaged in solicitation of insurance in California without a license for nearly eight months after signing the Agreement, including with respect to Morris under Gellman's own theory of recovery. Had Gellman not solicited insurance contracts without a license during seminars and follow up meetings in San Diego in January, March, April, June, and September, including with the Glassmans, there would be no referral to Morris to be encompassed by the Agreement, no review of insurance illustrations generated for Morris, and no participation in the "analytical process" to sell Morris life insurance. (Ex. 6, 233, 237.) As the Arbitrator found, commissions as to the Morris Policy (among others) "either were earned during the relationship of the parties" or came to fruition "because of Gellman's involvement ***in the sales work performed in the procurement***." (Ex. 28, 2219–20, emphasis added.) "[S]ales work performed in the procurement" of an insurance policy is nothing more than "soliciting" an insurance contract. Thus, the Arbitrator manifestly disregarded the law by relying only on the portion of Section 1633 prohibiting insurance contracts from being placed without a license and not also from being solicited through marketing activities compelled by a contractual obligation to sell insurance in the first place.

Other cases relied upon by the Arbitrator are also inapposite. For example, in *Houston v. Williams*, an unlicensed plaintiff was allowed to maintain a cause of action for unpaid commissions for the sale of property for which plaintiff found a buyer because he was unlicensed at the time of his agreement with the seller but had a license by the time of the sale. 53 Cal.App. 267, 270 (1921). However, the

16

statute at issue was limited by a related provision that required a license to engage in business as or conduct the activities of a real estate broker only "at the time the alleged cause of action [for unpaid commissions] arose." *Id*. at 271. Absent such a temporal limitation in Section 1633, which prohibits the solicitation of insurance contracts without a license regardless of *when* the cause of action for unpaid commission arose, *Houston* does not excuse the Arbitrator's disregard of the law. *Radich v. Cernokus*, 65 Cal.App. 452, 454 (1924) is also inapposite as the real estate agent who was not licensed when he signed the listing agreement obtained his license **before** procuring a buyer for the property, that is, before performing under his contract. Likewise, *Multifamily Captive Group, LLC v. Assurance Risk Managers, Inc*., 578 F.Supp.2d 1242, 1247 (E.D. Cal. 2008) is unhelpful as it dealt with a circumstance where a corporation, and not the individual who held the insurance broker license, was a party to the commission sharing agreement.

      B.    <u>The Arbitrator's Damages Award Manifestly Disregards the Law Prohibiting Attorneys' Fees Without Contractual or Statutory Basis, Emotional Distress Damages for Mere Breach of Contract Without an Independent Tort, and Punitive Damages for Litigation Conduct</u>

      1.    <u>Attorneys' Fees Were Not Allowed by Contract or Statute</u>

Under the well-settled American Rule on the payment of attorney's fees in federal litigation, arbitrators, just like courts, can only award attorneys' fees and costs to a prevailing party **if** such fees or costs are authorized by an enforceable contractual fees provision or by statute. *See Buckhannon Bd. and Care Home, Inc. v. W. Virginia Dept. of Health and Human Res.*, 532 U.S. 598, 602 (2001); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975).

Here, except for requiring the parties to share fees and costs related to arbitration before the AAA, the Agreement expressly required the parties to bear their own fees and costs and did not allow for an award of fees or costs to compel

17

arbitration or to the prevailing party in arbitration. (Ex. 1, 14 ¶17.) Nor does the FAA, the sole statutory basis for this Court's underlying order compelling arbitration, expressly provide for the payment of attorney's fees to a litigant who obtains a judicial order compelling arbitration. *See Am. Reliable Ins. Co. v. Stillwell*, 336 F.3d 311, 320 (4th Cir.2003); *accord Electrolux Home Prods., Inc. v. United Auto., Aerospace and Agricultural Implement Workers of Am.*, 343 F.Supp.2d 747, 761 (N.D. Iowa 2004) ("The Federal Arbitration Act does not contain any provisions providing for awards of attorneys' fees to successful or prevailing parties."), *aff'd*, 416 F.2d 848 (8th Cir. 2005). While there is limited authority that awarding attorney's fees to a party who prevails on a motion to compel arbitration under the FAA "would further Congress's intention to 'rigorously enforce' arbitration agreements," it does not apply here. *Olle v. 5401 Western Ave. Residential, LLC*, 569 F.Supp.2d 141, 147 (D.D.C. 2008). This is because the district court in *Olle* recognized that this statement related to "a hypothetical conflict not currently before the court" and was "not yet ripe for judicial resolution"—that is, whether the parties' contract clause to award the seller its costs if the buyer commenced a legal action in violation of the arbitration clause was unreasonably one-sided. *Ibid.*

Thus, the Arbitrator exceeded his power by awarding Gellman $8,400 in fees for compelling arbitration in this matter.

2. <u>No Emotional Distress Damages Flow from Breach of Contract Absent Physical Harm or Specialized Facts Not Present Here</u>

In awarding $100,000 for emotional distress, the Arbitrator relied on Gellman's testimony that he "suffered from understandable loss of sleep and increased stress as a result of the conduct forming the basis of his claims," that is, Hunsinger's refusal to let him participate in selling insurance to prospective clients and denying him commissions ***under the Agreement***. (Ex. 28, 2245; RT 434:2–3,

458:22–460:7.) But California law requires more than negligent performance or failure to perform a contractual duty for an award of emotional distress damages; it requires intentional breach of an independent duty not arising under contract or the infliction of physical injury. *Butler-Rupp v. Lourdeaux*, 134 Cal.App.4th 1220, 1229 (2005) (reversing award of emotional distress damages because defendants' negligent performance of contractual duties under the parties' lease incurred liability only for breach of contract absent showing of physical injury or breach of independent duty arising in tort). As the Court in *Buttler-Rupp* explained, defendants were "circumscribed by their obligations under the lease and were confined to fulfilling plaintiff's contractual expectations of economic gain," and solely "economic injury to plaintiff" affirmatively "precludes recovery of damages for emotional distress." *Ibid.* As in that case, Gellman here suffered only economic harm as a result of Hunsinger's alleged breach of the parties' Agreement, such as lost commissions from the sale of insurance policies. Hunsinger owed no independent duty to Gellman outside the parties' Agreement, as discussed below, and Gellman suffered no physical harm. Nor did the underlying contract dispute fall within a specialized classes cases in which courts have allowed emotional distress damages absent physical harm or an independent tort duty. *E.g., Erlich v. Menezes,* 21 Cal.4th 543, 554 (1999) (collecting cases permitting emotional distress damages for breach of contract where it causes physical injury, breaches the covenant of good faith and fair dealing in insurance contracts, results in wrongful discharge in violation of public policy, or where the contract was fraudulently induced); *Branch v. Homefed Ban*k, 6 Cal.App.4th 793, 800 (1992) (collecting cases involving mental distress damages where defendant mishandled plaintiff's brother's cremated remains; gave negligent advice to plaintiff's wife that she had syphilis; caused plaintiff to witness an injury to a close relative; or refused in bad faith to pay insurance proceeds);  Under these circumstances, "the

19

affirmance of the award of damages for emotional distress would blur the distinction between contract and tort, thereby violating the policy underlying the economic loss rule." *Butler-Rupp*, 134 Cal.App.4th at 1229.

To the extent the Arbitrator relied on finding in favor of Gellman on his tort claims to award emotional distress damages, Hunsinger addresses the manifest disregard of the law regarding that analysis in the next section.

> 3.   Punitive Damages are Prohibited for Litigation Conduct and Require an Underlying Tort and Evidence of Ability to Pay

As preserved in Hunsinger's closing briefs and motion to correct (Exs. 22, 2251; Ex. 25), the Arbitrator's punitive damages award was in excess of his power for three independent reasons, each of warrants vacatur.

First, punitive damages are ***not*** allowed for litigation misconduct, for which there are discovery or other sanctions. *De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates*, 94 Cal.App.4th 890, 918 (2001) (litigation conduct and trial tactics may not serve as a basis for punitive damages); *Karlsson v. Ford Motor Co.*, 140 Cal.App.4th 1202, 1209–1211 (2006) (affirming imposition of issue and evidentiary sanctions against defendant for various discovery abuses and reinstatement of punitive damages based on separate conduct in marking product known to be defective and dangerous). Courts have explained the policy reasons underlying this settled law, including that it improperly holds the client responsible for the attorney's litigation strategy and fails "'to consider or accord any weight to the right of a defendant to defend itself.'" *Palmer v. Ted Stevens Honda, Inc.*, 193 Cal.App.3d 530, 539–540 (1987) (reversing award of punitive damages where plaintiff tried to establish tort of bad faith denial of the existence a contract with evidence of defendant's alleged bad faith litigation tactics because actions taken by party "once litigation has commenced" are not "probative of whether defendant in bad faith denied the

20

contractual obligation prior to the lawsuit").

Notwithstanding this law, the Arbitrator found that Hunsinger acted with malice, fraud, and oppression based solely ***on her litigation conduct***, such as allegedly "lying under oath on multiple occasions throughout the arbitration," "repetitively contradicting her deposition testimony on critical issues," and "delet[ing] and fail[ing] to produce critical text messages exchanged between herself and Glassman." (Ex. 28, 2245.) Overruling Hunsinger's objections in the motion to correct, the Arbitrator reiterated that "***evidence of oppression, malice and fraud were clearly obvious***" based ***solely on Hunsinger's litigation conduct***, such as being "impeached" or caught "lying under oath"; "contracting her deposition testimony on critical issues"; deleting or failing to produce her texts with Glassman; being implicated in the refusal of "witnesses aligned with her" refusing to be deposed; refusing "to pay her share of the arbitration fees"; and having her "credibility" shattered. (*Id*. at 2251, emphasis added.) Even assuming these findings were undisputed, which they are not (*e.g*., Hunsinger Decl. ¶22), Gellman's remedy was limited to discovery or other sanctions which the Arbitrator imposed by, for example, prohibiting Morris and Glassman from testifying; making adverse credibility findings against Hunsinger; cutting off the arbitration at three days to limit Gellman's daily fees; and awarding Gellman arbitral fees that Hunsinger could not afford to pay. Thus, punitive damages for litigation conduct not just prohibited, but also rendered unnecessary by prior sanctions.

Second, the Arbitrator awarded punitive damages by disregarding established California law that contract obligations cannot be repurposed as "tortious" to award punitive damages. Cal. Civ. Code § 3294(a) (providing punitive or exemplary damages for defendant's "oppression, fraud, or malice" in "an action for the breach of an obligation ***not*** arising from contract") (emphasis added); *Miller v. Nat'l Am. Life Ins. Co*., 54 Cal.App.3d 331, 336 (per Section

21

3294(a), punitive damages are never available solely for breach of contract, "even where the breach is intentional, willful, or in bad faith"); *accord Myers Bldg. Indus., Ltd v. Interface Tech., Inc.*, 13 Cal.App.4th 949, 960 (1993), *as modified on denial of reh'g* (Mar. 26, 1993); *see also Chelini v. Nieri*, 32 Cal.2d 480, 486–487 (1948) (punitive damages theory cannot be predicated on the breach of contract cause of action without an underlying tort). In response to briefing on this law in the motion to correct (Ex. 25), the Arbitrator relied on a further disregard of the law as to Gellman's failure to establish the element of his tort claims and improper characterization of the same conduct constituting breach of contract as tortious.

For example, the Arbitrator found Hunsinger liable for intentional and negligent interference with Gellman's prospective economic relations with Morris and Glassman despite settled law that only a stranger to a contract, and not party to a contract, cannot be liable for any "interference" torts:

> Our courts recognize four types of claims for interference with contractual rights or expectancies: Intentional or negligent interference with an existing contract and intentional or negligent interference with prospective economic advantage. (Citations.) The elements of those causes of action have been discussed and detailed by many decisions, but only one element common to all four is relevant here: ***that a party to the plaintiff's contract cannot be liable under any of the four theories. If the defendant is a party to the contract, the plaintiff is relegated to a cause of action for breach of that contract***.

*Woods v. Fox Broad. Sub., Inc.*, 129 Cal.App.4th 344, 350 (2005) (citations omitted; emphasis added); *Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393 (1995) (for interference with prospective economic advantage, defendant's conduct must be proscribed by some independent constitutional, statutory, regulatory, common law, or other standard so it is "wrongful by some legal measure other than the fact of interference itself"); *accord Korea Supply Co.*

22

*v. Lockheed Martin Corp*., 29 Cal.4th 1134, 1153 (2003).

Similarly, the Arbitrator found Hunsinger liable for conversion based on her failure to pay Gellman contractual commissions, ignoring settled law that "a mere contractual right of payment, without more, will not suffice" to support a claim for conversion. *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal.App.4th 221, 232–33 (2014) (citation omitted). Next, in finding for Gellman on the torts of negligent and intentional misrepresentation, the Arbitrator disregarded the law that breach of a contractual promise is enforceable ***only*** through contract law unless the parties owe each other an ***independent*** duty arising under tort law. *Erlich*, 21 Cal.4th at 550–54 (negligent or intentional misrepresentation must be based on duty completely independent of the contract at issue).

Finally, in finding for Gellman on his breach of fiduciary duty claim based on the parties' alleged fiduciary relationship as joint venturers or partners, the Arbitrator disregarded the law that a contract's plain language governs its interpretation, and that the Agreement expressly states that the parties were independent contractors, not co-venturers or partners. (Ex. 1, 13 ¶9); Cal. Civ. Code §§ 1635, 1636, 1638, 1639. In disregarding the requirement to give effect to the parties' mutual intent, as expressed in their contract, the Arbitrator exceeded his powers. *Cf., Kurtin v. Elieff*, 215 Cal.App.4th 455, 467–68 (2013) (arbitrator's powers are fixed by arbitration agreement); *Mich. Mut. Ins. Co. v. Unigard Sec'y Ins*. Co., 44 F.3d 826, 830 (9th Cir. 1995) (award must "draw its essence" from the contract); *Gherardi v. Citigroup Global Markets Inc*., 975 F.3d 1232, 1237 (11th Cir. 2020) (vacatur under FAA Section 10(a)(4) allowed "only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." (internal quotes omitted).)

Third, and finally, the Arbitrator both disregarded the law and the evidence requiring a due process inquiry into Hunsinger's ability to pay before awarding

1   $375,000 in emotional distress and punitive damages. *Adams v. Murakami*, 54
2   Cal.3d 105, 114–16, 119 (1991) (proof of a defendant's financial condition is a
3   "prerequisite" to awarding punitive damages and plaintiff seeking punitive
4   damages, not defendant, bears the burden of presenting evidence of defendant's
5   financial condition). Because the purpose of punitive damages is "to deter, not to
6   destroy," and such damages are a "windfall" on top of compensatory damages,
7   punitive damages must not be disproportionate to the defendant's ability to pay,
8   which can only be determined from evidence of defendant's financial condition. *Id*.
9   at 112–13, 120. The Arbitrator's explanation that Hunsinger waived this argument
10  by not seeking a bifurcated trial with respect to liability and damages disregards
11  the settled law that plaintiff bears the burden of establishing defendant's ability to
12  pay. *Id*. at 120 ("bedrock concerns" of "'policy and fairness'" support placing the
13  burden on plaintiff to prove defendant's financial condition). Moreover, regardless
14  of who bears the burden "the absence of such [financial condition] evidence raises
15  doubt as to the constitutionality of a punitive damages award." *Id*. at 119.

16      The Arbitrator further disregarded the law by selectively citing evidence that
17  Hunsinger earned a $428,547.30 commission for the Morris Policy and $363,902
18  in commissions for other policies in 2018, while disregarding evidence that her
19  earnings had since dried to the point that she had to tell the AAA repeatedly she
20  could not afford her share of arbitral fees due to her personal situation; the fallout
21  from the 2016 presidential election, and the pandemic's impact on the insurance
22  industry. (*Compare* Ex. 28 2252 *and* RT 974:15–20 *with* RT 760:20–23, 768:17–
23  770:1 *and* Exs. 35–37.) Gellman's attorneys were aware of Hunsinger's changed
24  circumstances as they were copied on several of these emails, and the Arbitrator
25  also knew as AAA staff told Hunsinger that he was sympathetic to her plight after
26  she and her attorney advised that she was a single mother with sole parenting
27  responsibilities and no insurance business due to the pandemic. (Ex. 35, 2334; Ex.
28

24

36, 2337; Ex. 37, 2340–41.) Had the Arbitrator conducted the necessary due process inquiry into Hunsinger's ability to pay, he would have learned through her supplemental submissions that she has a net worth of only $35,000 because, she (1) has had to take extraordinary measures as a domestic violence survivor to abandon her home and go into hiding to protect herself and her son; (2) has depleted her savings and incurred significant debt to pay living expenses plus legal fees to fight her abuser's harassing litigation while defending this arbitration; (3) has no real estate, investment, or retirement assets; (4) has been earning little to nothing because of her personal situation and the pandemic; (5) has had to reduce her staff from four to one and has had her business suspended for failure to pay past-due taxes; and (6) is raising her son alone without court-ordered child support or other help. (Hunsinger Decl. ¶¶4–21, 23 & Exs. 29–37.) Indeed, Hunsinger will be "annihilated" and face bankruptcy as her insurance and real estate licenses are at risk if the punitive damages award and underlying findings stand. (Hunsinger Decl. ¶21); *Adams*, 54 Cal.3d at 113 (ability to pay inquiry is necessary precisely because "a punitive damages award can financially annihilate the defendant").

## V.    CONCLUSION

Vacatur of arbitration awards is admittedly rare. But for the reasons discussed, it is warranted here—either in full or at least with respect to specified aspects of damages—to protect Hunsinger from the Arbitrator's manifest disregard of the law, a violation of due process, and fundamental unfairness.

Dated:  May 8, 2021                     Respectfully Submitted,

                                        NIDDRIE | ADDAMS | FULLER | SINGH LLP

                                        By:    /s/ Rupa G. Singh
                                               Rupa G. Singh

                                        Attorneys for RESPONDENTS